UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

UNITED STATES OF AMERICA

v. No. 2:18-cr-113

Adonis Marquis PERRY,

Defendant.

MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

Defendant, Adonis Perry, was charged in a Superseding Indictment with six counts, including felon in possession of one or more firearms and possession of marijuana. His arrest followed a traffic stop and search of the vehicle he occupied, during which Norfolk Police Officers recovered two firearms and a quantity of marijuana. His First Motion to Suppress, (ECF No. 28), seeks to exclude the evidence resulting from the search, arguing that the officers impermissibly expanded the scope of the stop, violating his Fourth Amendment right to be free from unreasonable search and seizure. The motion was referred to the undersigned for a Report and Recommendation under 28 U.S.C. § 636(b)(1) and Fed. R. Crim. P. 59(b). On October 24, 2018, the court heard evidence from both officers involved in the stop. In addition, exhibits to the motion included body camera video footage of the stop, the investigation, and the search which produced the firearms and marijuana. After considering this evidence, the parties' supplemental arguments,

and for the reasons explained in detail below, the undersigned recommends that the court DENY Perry's First Motion to Suppress.

## I. Recommended Findings of Fact

On December 18, 2017, Officers Miller and Para were on patrol in the Huntersville neighborhood in the City of Norfolk. Huntersville is a high-crime area, known to both officers as troubled by gang activity and violent crime. Shortly after midnight, while traveling southbound on O'Keefe Street, the officers passed a dark-colored SUV with no front license plate heading northbound on O'Keefe. Officer Miller looked in his rearview mirror as the car passed and noticed that the rear plate "looked like a piece of paper with marker on it." Tr. of Hr'g on First Mot. Suppress 7 (ECF No. 43 at 7) (hereinafter "Tr.").

The officers initiated a U-turn in order to investigate the suspicious license tags. Officer Miller observed that the vehicle "appeared to be fleeing." Id. He saw it accelerate and disregard two stop signs. Officer Miller's body camera captured the final fifteen seconds of the vehicle pursuit, which reveals the vehicle moving through one sign-controlled intersection. Gov't's Resp. to Def.'s Mot. to Suppress Ex. A, at 0:00-0:15 (hereinafter "Miller

Bodycam").[1] The footage also shows both stop signs which the officers passed during their pursuit. Id.

The SUV turned into the parking lot of an apartment building in a residential area. The officers' patrol vehicle arrived behind it within ten seconds with its emergency lights activated. When the officers arrived, the passenger door to the SUV was wide open, indicating to both officers that an occupant was already outside the vehicle and may have been attempting to flee. Tr. at 12, 116. Immediately after arriving, an occupant of the vehicle, later identified as its owner, Beatrice McCarr, exited the vehicle from the driver's side and began walking toward the police car. Within a few seconds the Defendant also exited the vehicle from the driver's side.

Both officers testified that, prior to his exiting the vehicle, they observed Perry kneeling or crouching in the passenger seat before climbing over the center console to exit the vehicle on the driver's side. Officer Miller's body camera footage is not sufficiently clear to show Perry's actions inside the car, but the Defendant clearly exits from the driver's side.

[1] Pincites to body camera footage refer to timestamps on the digital recordings. Although activated at some time during the pursuit, the dash camera footage from the officers' police cruiser was not preserved.

The officers had drawn their weapons and ordered both Defendants to show their hands and begin walking backwards towards the patrol vehicle. Both complied, and each was separately handcuffed for the officers' safety, and separated. Officer Miller advised Perry that he was being detained. Officer Miller testified that the circumstances of the vehicle pursuit and Perry's exit from the vehicle were unusual and that he detained him to investigate "the license plate, why they appeared to be eluding me and disregarding two stop signs, and the movement that we saw toward the floorboard, and why they both came out of the driver's side of the vehicle." Tr. at 14-15.

Approximately one minute into the stop, Officer Miller began to ask Perry about the unusual tags. He also asked Perry for identification and radioed in for a check under NCIC/VCIN. Prior to placing Perry in the back of his patrol vehicle, Officer Miller also conducted a protective pat-down search during which he observed and removed a blue bandana visible from the Defendant's pants pocket. Near the same time, dispatch radioed the results of the NCIC/VCIN check to both Officers Miller and Para, reporting that Perry had a suspected gang affiliation. Tr. at 22; Miller Bodycam at 4:19. Perry had also responded to Officer Miller's inquiries concerning the license tag, telling the officer that it was a 30-day tag and that McCarr had purchased the vehicle in South Carolina. Miller Bodycam at 2:40.

Officer Para did not immediately activate his body camera and thus there is no footage from the time he was separately examining McCarr,[2] but approximately five minutes into the stop he requested consent from McCarr to search the vehicle, which she provided. This exchange is captured on Officer Miller's body camera video footage. Miller Bodycam at 5:10. Within a minute of commencing the search, Officer Para located the first weapon, a revolver-style handgun. Officer Miller joined Officer Para to examine the weapon and stated it was "loaded and hot," meaning the gun contained ammunition and the safety was off. Tr. at 26. The first handgun was located on the passenger side of the vehicle in McCarr's purse. Tr. at 123. The officers asked McCarr who owned the gun. She stated that it was Perry's and that it was his "family gun." Tr. at 26. After conferring with each other about the revolver, Para returned to finish searching the vehicle. Approximately ten minutes into the stop he discovered the second handgun, a loaded Glock 9mm with an extended magazine.

Officer Para's testimony and partial body camera footage are largely consistent with Officer Miller's. He also testified regarding the initial pursuit, the nature of the Huntersville

---

[2] Officer Para testified that he intended to start his body camera at the outset of the stop but mistakenly failed to turn it on. After he began searching the vehicle, he realized the camera was not recording and started it at that time. Tr. at 124-25.

neighborhood, and the subject's unusual exit from the vehicle. He testified that he confirmed McCarr owned the vehicle and obtained her consent to search it as shown on Officer Miller's body camera footage.

Officer Para also testified that he had seen both guns in plain view prior to seeking consent to search the vehicle. Officer Para's plain-view testimony was not credible for several reasons. First, during the stop, he did not mention seeing a gun until he secured the first gun during the consent search. At that time he loudly announced, "gun" to warn his partner of the presence of a firearm. Tr. at 24; Miller Bodycam at 5:56. Later, while conferring with Officer Miller about the revolver, Para made no mention to his partner of having earlier seen a second gun in plain view. Finally, his recovery of the second weapon is captured on his own body camera footage. Immediately after recovering the second gun, Para again announces it to his partner, stating "I got another one." Gov't's Resp. to Def.'s Mot. to Suppress Ex. B, at 2:06. The images of the search and discovery of this second handgun are inconsistent with Para's statement that he had earlier observed it in plain view. Accordingly, the recommended legal conclusions in this report are based on the testimony and video evidence which indicates that neither gun was in plain view, and Officer Para's statements to the contrary could not be a basis for expanding the stop to request consent to search the vehicle.

## II. Recommended Conclusions of Law

Perry argues that the officers violated his Fourth Amendment rights by unlawfully extending his detention beyond the time "reasonably necessary" to investigate the pertinent traffic violation. According to Perry, the police had no justification to investigate matters unrelated to the license plate issue, and by doing so they illegally extended the duration of the stop. Furthermore, although Perry largely admits that McCarr gave valid consent to search the car, he argues that she could not validly consent to his continued detention. Perry thus constructs a "but-for world" in which the police diligently investigate the license plate issue before sending the vehicle and its occupants on their way, unsearched. See Def.'s Suppl. Br. On First Mot. Suppress 4 n.1 (ECF No. 46 at 4 n.1). The officers' departure from that chain of events, Perry argues, violated his Fourth Amendment rights, notwithstanding McCarr's consent to search the vehicle. The United States in response argues that Perry lacks standing to challenge the vehicle search and that, even if the court examines the search, the officers had reasonable suspicion to support the entirety of their investigation during the stop.

### A. Legal Standards

On a motion to suppress, the initial burden of showing a constitutional violation occurred is on the defendant. United States v. Dickerson, 655 F.2d 559, 561 (4th Cir. 1981). "Once the

defendant establishes a basis for his motion ... the burden shifts to the government to prove the admissibility of the challenged evidence by a preponderance of the evidence." United States v. Hunter, 63 F. Supp. 3d 614, 619 (E.D. Va. 2014).

Traffic stops are "seizures" under the Fourth Amendment and therefore must be reasonable. United States v. Williams, 808 F.3d 238, 245 (4th Cir. 2015). Because a routine traffic stop is limited in duration and scope, courts analyze their constitutionality using the two-prong standard applicable to investigatory detentions. Id. ("[A] traffic stop is more akin to an investigatory detention than a custodial arrest."); see generally Terry v. Ohio, 392 U.S. 1 (1968). First, a traffic stop must be legitimate at its inception. United States v. Hill, 852 F.3d 377, 381 (4th Cir. 2017). Second, police actions during the stop must be "reasonably related in scope" to the basis for the stop. Id. (quoting Williams, 808 F.3d at 245).

A traffic stop's permissible duration is a function of its "mission," which will ordinarily include investigating the traffic violation that precipitated the stop and attending to officer safety concerns. See Rodriguez v. United States, 135 S. Ct. 1609, 1614 (2015) ("Authority for the seizure thus ends when tasks tied to the traffic violation are—or reasonably should have been—completed."). Officers may also conduct "ordinary inquiries" incident to the traffic stop. Id. at 1615 (quoting Illinois v.

Caballes, 543 U.S. 405, 408 (2005)). These typically include "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." Id. In the interest of officer safety, officers may also run criminal record checks on vehicle occupants, including passengers. Hill, 852 F.3d at 383. A stop that extends beyond the time necessary to complete these tasks may become unreasonable and thus unlawful. See Caballes, 543 U.S. at 407; see also Rodriguez, 135 S. Ct. at 1615-16 (holding that even a *de minimis* extension can violate the Fourth Amendment). In other words, whether an extended detention stemming from a lawful traffic stop remains permissible under the Fourth Amendment turns on whether that extension is *justified* (whether by consent or reasonable suspicion), not on its precise length or when exactly it occurs. See Rodriguez, 135 S. Ct. at 1614-15.

This limitation does not mean that police are completely prohibited from inquiring into other matters during a lawful stop. "While diligently pursuing the purpose of a traffic stop, officers also may engage in other investigative techniques unrelated to the underlying traffic infraction or the safety of the officers." Hill, 852 F.3d at 382. However, such actions may not *prolong* a stop "absent consent of those detained or reasonable suspicion of criminal activity." Id.

Continued intrusion based on reasonable suspicion is permitted when the totality of the circumstances provides "a particularized and objective basis for suspecting the particular person stopped of criminal activity." United States v. Cortez, 449 U.S. 411, 417-18 (1981). An officer "must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrants that intrusion." Terry, 392 U.S. at 21. This standard is a "commonsense, nontechnical" one, relying on the "judgment of experienced law enforcement officers, 'not legal technicians.'" United States v. Palmer, 820 F.3d 640, 650 (4th Cir. 2016) (quoting Ornelas v. United States, 517 U.S. 690, 695 (1996)).

**B. Analysis**

Perry does not challenge the initial justification for the stop in this case. Accordingly, the focus is on whether the officers' conduct during that stop unlawfully extended its duration in violation of the Fourth Amendment.

Some of Perry's complaints can be rejected with little trouble. Officer Miller was entitled to ask for Perry's identification "to gain his bearings and to acquire a fair understanding of the surrounding scene." United States v. Soriano-Jarquin, 492 F.3d 495, 500 (4th Cir. 2007). He was also entitled to "search a computer database" to determine Perry's "prior contact with law enforcement," regardless of whether Perry was a driver or

passenger. See Hill, 852 F.3d at 383. Such actions are reasonable means of ensuring officer safety in stops involving passengers. See id. And this is so even in the case of routine traffic stops involving no more than the usual danger officers encounter from the close contact with unknown occupants inherent in traffic enforcement. See United States v. Robinson, 846 F.3d 694, 698-99 (4th Cir. 2017) (elaborating on the potential danger of routine traffic stops).

In this case, Miller's actions during his encounter with Perry are important in evaluating the instant motion because they informed both officers' conduct through the remainder of the stop. This highlights the critical problem with Perry's argument: it ignores, or at least seeks to downplay, the context in which *this* stop evolved. Relying principally on a broad reading of Rodriguez, Perry seeks to freeze the circumstances as they existed the moment suspicion for the stop materialized. He then contests the officers' actions against this blindered version of reasonable suspicion, affording the officers far less flexibility to investigate than they were owed under the Fourth Amendment. His argument fails because Rodriguez is not as limiting as he posits and because the officers in fact had ample reason to expand the scope of the stop.

While Rodriguez provides the fundamental rule of decision here, it fails to provide much useful guidance. Its highly compartmentalized fact pattern ultimately made for an easy case.

The challenged conduct in Rodriguez (a dog sniff) occurred only *after* the detaining officer completed all the tasks related to a lawful traffic stop. See 135 S. Ct. at 1613. The officer went as far as to say, "I got all the reason[s] for the stop out of the way[,] ... took care of all the business." Id. (alterations in original).

Unlike Rodriguez, this was no ordinary traffic stop. The most useful question here is not whether the officers' conduct exceeded the scope of a routine traffic stop. Rather, it is whether the circumstances surrounding this stop supported an expanded scope within its first moments. This report concludes that they did. Circumstances articulated by the officers justified continued detention essentially from the moment they initiated the stop.

The officers identified several particularized facts and circumstances that informed their suspicions. All of them are supported by the evidence. They included (1) the time (around midnight); (2) the location (a known high-crime area; (3) the unusual nature of the observed traffic violation (an apparently hand-written vehicle tag bearing only a date); (4) the car's acceleration through two stop signs when the police turned around; (5) that the car's passenger door was open and the occupants were already exiting when the officers arrived; (6) Perry's climbing over the center console to exit the driver's side door; and (7)

the blue bandana in Perry's pocket, combined with the dispatch report that he had gang affiliations.[3]

Courts have cited many of these factors when finding reasonable suspicion sufficient to justify detention. See, e.g., Illinois v. Wardlow, 528 U.S. 119, 124-25 (2000) (citing "presence in an area of heavy narcotics trafficking" and "unprovoked flight upon noticing the police"); Palmer, 820 F.3d at 651-52 (citing presence in high-crime area and reported gang affiliation); United States v. Lender, 985 F.2d 151, 154 (4th Cir. 1993) (citing "lateness of the hour"); United States v. Walker, No. 3:08-CR-41, 2009 WL 385247, at *3 (E.D. Va. Feb. 13, 2009) (citing late hour, high-crime area, and suspect's unprompted exit from the vehicle); cf. United States v. Driver, 513 F. App'x 277, 280 (4th Cir. 2013) (unpublished per curiam opinion) (citing late hour and car's erratic driving immediately before stop); United States v. Branch, 537 F.3d 328, 338-39 (4th Cir. 2008) (citing suspect's nervous

[3] Notably absent from this list is the suggestion that either officer saw the guns in plain view before beginning the vehicle search. The government urges this court to decide this motion on standing grounds, thereby obviating any need for credibility determinations as to Officer Para's testimony. The undersigned declines this invitation for two reasons. First, the standing question is not as clear-cut as the government suggests. See discussion, infra. Second, the government in its initial opposition brief explicitly relied on plain-view evidence to argue that the officers had reasonable suspicion. See Gov't's Resp. to Def.'s Mot to Suppress 6, 18 (ECF No. 29 at 6, 18). The presence or absence of such evidence is obviously a substantial component of any reasonable suspicion determination and therefore relevant here.

behavior and known drug trafficking history combined with fact that car was not registered to driver).

Miller and Para had ample justification to expand the investigatory detention. The stop bore little resemblance to Perry's hypothetical "but-for world" in which the only matter of investigation was an improper tag. For instance, rather than pull over, the vehicle accelerated away from the police. Both occupants were already exiting the vehicle when the officers arrived. The court also credits the officers' testimony that open car doors indicate that a suspect is attempting to flee. See Lender, 985 F.2d at 154 ("Courts are not remiss in crediting the practical experience of officers who observe on a daily basis what transpires on the street."). Officer Miller testified that he had never seen someone jump over the center console during a traffic stop before. Tr. at 14. Those facts, in this context, "reasonably warrant[ed]" additional investigation. Terry, 392 U.S. at 21. Accordingly, neither the firearms found during the car search nor the marijuana found on Perry's person should be suppressed.

The government insists that Perry lacks standing to challenge the car search under any circumstances because he had no "legitimate expectation of privacy" in the vehicle. See Rakas v. Illinois, 439 U.S. 128 (1978). Yet again, however, this case proves more complicated than one side lets on. Perry responds to the standing objection by arguing that he is not challenging the

search *per se*, but rather his unreasonable seizure. Perry claims that by engaging in the search, the officers unconstitutionally prolonged his detention without justification. Perry's opposition to the standing issue is therefore linked to his artificially narrowed conception of the stop's purpose. Because the undersigned concludes that the officers had reasonable suspicion to conduct their investigation as they did, it is unnecessary to explicitly decide this somewhat murky standing issue. See City of Charleston v. Pub. Serv. Comm'n of W. Va., 57 F.3d 385, 390 & n.5 (4th Cir. 1995) (recognizing that standing, although "usually a threshold inquiry," can be bypassed when a clear resolution on the merits is available).

**Conclusion**

For the foregoing reasons, the undersigned recommends that Perry's First Motion to Suppress on the Superseding Indictment, (ECF No. 28), be DENIED.

**Review Procedure**

By copy of this report and recommendation, the parties are notified that pursuant to 28 U.S.C. § 636(b)(1)(C):

1. Any party may serve upon the other party and file with the Clerk written objections to the foregoing findings and recommendations within fourteen (14) days from the date of mailing of this report to the objecting party, see 28 U.S.C. § 636(b)(1), computed pursuant to Rule 6 (a) of the Federal Rules of Civil

Procedure. Rule 6(d) of the Federal Rules of Civil Procedure permits an extra three (3) days, if service occurs by mail. A party may respond to any other party's objections within fourteen (14) days after being served with a copy thereof. See Fed. R. Civ. P. 72(b)(2) (also computed pursuant to Rule 6(a) and (d) of the Federal Rules of Civil Procedure).

2. A district judge shall make a de novo determination of those portions of this report or specified findings or recommendations to which objection is made.

The parties are further notified that failure to file timely objections to the findings and recommendations set forth above will result in a waiver of appeal from a judgment of this Court based on such findings and recommendations. Thomas v. Arn, 474 U.S. 140 (1985); Carr v. Hutto, 737 F.2d 433 (4th Cir. 1984); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984).

/s/
Douglas E. Miller
United States Magistrate Judge

DOUGLAS E. MILLER
UNITED STATES MAGISTRATE JUDGE

November 9, 2018