UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

UNITED STATES OF AMERICA

v.                                    Criminal No. 2:18-cr-113

ADONIS MARQUIS PERRY,

        Defendant.

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

Defendant Adonis Perry's ("Defendant" or "Perry") Motion to Dismiss Count I of the Superseding Indictment (ECF No. 32) presents the question of whether the Government's failure to preserve potentially exculpatory dashcam video evidence deprived him of due process under Arizona v. Youngblood, 488 U.S. 51 (1988). The motion was referred to the undersigned for a Report and Recommendation under the provisions of 28 U.S.C. § 636(b)(1)(B) and Rule 59(b) of the Federal Rules of Criminal Procedure. (ECF No. 49). This Report concludes that the dashcam video evidence was not destroyed in bad faith, and that comparable evidence is available from the arresting officers' preserved bodycam video footage and witness testimony. Accordingly, it recommends the court deny Perry's Motion to Dismiss Count I.

## I. FACTUAL BACKGROUND

Perry was charged in Count I with felon in possession of a firearm following a traffic stop of a vehicle he occupied in the City of Norfolk. During the stop, investigating officers Para and

1

Miller recovered two handguns on the front passenger side floor of the vehicle. The other vehicle occupant, Beatrice McCarr, consented to the officers' search of the vehicle, and there is no dispute that the vehicle was hers. One of the guns was found on top of McCarr's purse on the floor of the passenger side. The other was found beneath the front passenger seat.[1]

Perry, who is a previously convicted felon, and thus prohibited from possessing firearms, made no admissions regarding the firearms during the stop or afterwards. But the officers charged him in Count I based on McCarr's statements that the guns belonged to Perry and the officers' observations that Perry was occupying the passenger seat at the time of the stop. See Miller Bodycam No. 8 at 3:30; Govts. Resp. to First Mot. to Supp. Ex. A (ECF No. 29-1). Since Perry's arrest, witness testimony regarding who was actually driving the vehicle at the time of the stop has varied, and Perry's present motion claims the dashcam video footage, which was not preserved, would have been exculpatory by showing who was actually driving the vehicle and who was in the passenger seat at the time of the stop.

---

[1] The background facts are taken from the Report and Recommendation prepared on Perry's first Motion to Suppress and are derived from the testimony and bodycam footage of both arresting officers. See Oct. 24, 2018 Hrg. Tr. (ECF No. 43); R&R 2-7 (ECF No. 48); see also Miller Bodycam No. 8 at 18:32.

Following Perry's arrest, both officers stated in incident reports that McCarr was the driver and that Perry was the passenger. Brief Supp. Mot. to Dismiss Ex. C (Para Incident Rept.; Miller Arresting Officer Summ.) (ECF No. 32-3). However, during hearings on other pretrial motions, both officers modified their testimony somewhat. Each officer has now testified that it is possible Perry may have been driving at the time the officers initially encountered the vehicle. They have defended their earlier statements by describing the driver's long hair (Perry has long dreadlocks) and inferring that they could have been mistaken in thinking the driver was a female because McCarr exited from the driver's side of the vehicle. Both stated, however, that they are certain they saw Perry in the passenger seat immediately after they stopped the vehicle.[2] They stated he appeared to be reaching under the seat, and that he then climbed over the center console, exiting on the driver's side. See Para Testimony, Tr. of Oct. 24, 2018 at 112, 116, 158-59, 165; Miller Testimony, Tr. of Oct. 24, 2018 at 49-50, 57-58, 68-69.

For his part, Perry, by counsel, has also taken inconsistent positions regarding the identity of the driver. His brief on this

---

[2] Both officers are on video discussing their observations of Perry moving from the passenger seat to exit on the driver's side of the vehicle during the initial stop. See Miller Bodycam No. 1 at 4;45 – 4:55; 9:25 – 9:35.

motion cites to a videotaped exchange with Officer Miller, in which Perry implies that he was driving the vehicle and that McCarr was the passenger suggesting the video of the stop will disprove the officers' statement that McCarr was the driver. Br. Supp. Mot. to Dismiss 2-3 (ECF No. 32). The cited passage does not include any admission by Perry that he had been driving, but in a later exchange captured on the same bodycam footage Perry states that he moved from the driver's seat, climbing over the console to the passenger's seat. Miller Bodycam No. 8 at 18:59 to 19:10.[3] This would be consistent with Miller's bodycam footage of the stop itself, which shows the passenger side door open, but neither occupant exiting from that side of the vehicle. Miller Bodycam No. 1 at 0:30 to 0:40.

In his first Motion to Suppress, however, Perry argued that the officers impermissibly prolonged the stop in order to interrogate him. Perry took the position then that he was the passenger of the vehicle, and thus the officers had no justification for the inquiries which eventually revealed his alleged gang affiliation and other evidence used to justify expanding the stop and searching the vehicle. Br. Supp. First

---

[3] Miller's preserved bodycam footage is in the record as Ex. 1 to the Government's Brief opposing Perry's Motion to Dismiss. The exhibit is a DVD containing eight numbered segments from the stop and arrest.

4

Mot. to Suppress 2, 15 (describing Perry as the "suspected passenger of the vehicle" (emphasis in original)) (ECF No. 15).

Although Perry has taken inconsistent positions regarding his position in the vehicle, the evidence in the record on these pretrial motions establishes that he clearly expressed to the arresting officers his desire to preserve any video footage of the stop, and his belief that it would contradict the officers' statements. As exhibits to this motion, Perry introduced bodycam video evidence from his proceedings before the state magistrate. Following the officers' description of the arrest to the magistrate, Perry was offered an opportunity to speak and stated "I would like to state on the record that I want his body camera and his dash camera. I just want it [...] I just want it. That's all I want. That's all I want." Miller Bodycam Video No. 8 at 5:38. Perry renewed his requests for video footage in other exchanges with Officers Para and Miller. In total, Perry requested that officers preserve video taped evidence at least five times, and during several of these exchanges the officers appear to give Perry assurances that they would do so. See Miller Bodycam No. 8 at 12:00 to 15:00. Notwithstanding the foregoing exchanges, neither officer arranged to preserve the dashcam video, although both officers preserved the available body camera footage from their individual body-worn cameras.

According to the Government's briefing, neither officer was in a position to preserve the dashcam video because it was securely recorded on a hard drive in the trunk of their vehicle. At the hearing on this motion, Norfolk Police Officer Daniel Marko testified regarding the department's policies and practices, as well as the capabilities of the dashcam system. According to this evidence, all preservation requests had to be initiated with and acted upon by supervisors. The Government initially contended that Officers Para and Miller had missed a short window of time to preserve the dashcam video themselves by tagging it immediately after the camera stopped recording. However, the Government's subject matter expert, Officer Marko, testified that this function had been disabled by the time of Perry's stop, and thus all dashcam video had to be preserved by request to a supervisor. June 28, 2019 Hr'g Tr. at 19-20 (ECF No. 96). Accordingly, all preservation requests for dashcam footage at the time of Perry's arrest were handled by supervisors based on requests by officers, counsel, or others seeking to preserve the evidence.

In this case, Perry's state-appointed counsel did file a request for preservation of all available dashcam and bodycam footage. Unfortunately, the request was addressed by a state prosecutor who had "volunteered to assist" in Perry's case during its transition from a departing prosecutor to a yet-to-be-named successor. During this brief period of involvement, the assigned

prosecutor failed to check the box necessary for preservation of the dashcam footage, apparently under the mistaken belief that only body camera footage was available. Collard Decl., Govt. Resp. Ex. 3 at 3 (ECF No. 35-3). The Technology Support Unit received the request from the state prosecutor and produced all of the available footage from Officers Para's and Miller's tagged body camera recordings. Because the box for dashcam footage had not been checked, the footage was not copied for production in the case and was automatically erased under the department's 30-day preservation policy. Marko Testimony, Tr. of June 28, 2019 at 20.

Perry's present Motion argues the Government's failure to preserve the dashcam video violated his right to due process. He claims the missing evidence would be exculpatory by showing more clearly the occupants' positions in the vehicle at the time of the stop, and therefore rebut the inference that he possessed the firearms on the passenger floor. The loss of the evidence, he argues, requires that the court dismiss the firearm count in the indictment.

## II. ANALYSIS

The parties agree on the legal standard governing Perry's motion, which derives from the Supreme Court decisions in California v. Trombetta, 467 U.S. 479 (1984), and Arizona v. Youngblood, 418 U.S. at 57-58, which both held that the due process clause sometimes protects defendants from the Government's loss of

potentially exculpatory evidence.   In order to demonstrate a due process violation from its loss, the defendant must establish that (1) the evidence was at least potentially exculpatory; (2) the exculpatory value was apparent before the evidence was lost or destroyed; (3) the evidence was lost or destroyed in bad faith; and (4) no comparable evidence could be obtained by reasonably available means.  See Youngblood, 488 U.S. at 57-58; United States v. Newsome, 322 F.3d 328, 334 (4th Cir. 2003); Holdren v. Legursky, 16 F.3d 57, 60 (1994).

Perry argues that the Government's failure to preserve the dashcam footage meets each element of this four-part test.   The Government concedes none of them.   For purposes of this Report, the undersigned will presume that the evidence was at least potentially exculpatory.[4]   This assumption is based on Perry's claim that his position in the vehicle was different from the officers' initial reports which described him as the passenger. It is not clear whether the government will persist in contending at trial that Perry was not driving, given that both officers later qualified their testimony on that issue.   But it does appear that

---

[4] If the evidence was known to be exculpatory, its loss would implicate due process concerns regardless of the absence of bad faith.   United States v. Varner, 261 F. App'x 510, 517 n.8 (4th Cir. 2008).

each will state that after the vehicle stopped they observed Perry in the passenger seat.  This expected testimony makes video footage of the stop which might have identified the passenger seat occupant at least potentially exculpatory.  Nonetheless, there is no evidence that any of the Government actors responsible for the failure to preserve the dashcam evidence knew it did have exculpatory value before the ability to preserve the evidence was lost.  As a result, Perry cannot establish a due process violation because he cannot demonstrate bad faith in the Government's failure to preserve the evidence.  In addition, there is ample alternative evidence, including a nearly identical recording of the scene from Officer Miller's body camera footage, which negates any prejudice to Perry from the lost dashcam video.  Finally, any remedy short of dismissal is better left to resolution at trial after the Government's theory of proof is established.

**A. Perry has not shown that the Government acted in bad faith resulting in the lost evidence.**

Perry's bad faith argument is largely premised on a claim that the dashcam footage would illuminate the various witnesses' testimony regarding who was driving the vehicle at the time of the stop and who occupied the passenger seat where the guns were recovered.  In addition, he relies on body camera footage of his arrest and processing before a state magistrate during which Perry repeatedly implied that the officers had incorrectly identified

him as the vehicle passenger.  During this videotaped exchange, Perry appears to argue that McCarr had been in the passenger seat, with Perry driving, and that the two switched places immediately after the stop.  Several times during this exchange, Perry asked the officers to preserve video footage of the stop, suggesting it would contradict their statements to the magistrate that he was the passenger.

While Perry's statements during the appearance before the magistrate represent strong evidence that Officers Para and Miller knew of Perry's interest in the evidence and thus of its potential exculpatory value, they do not obviate the bad faith inquiry. Despite their understanding that Perry wanted the available footage, the undisputed facts show that neither Officer Para nor Miller had access to the dashcam footage.  They had not viewed it and thus did not know whether it captured any image of Perry's position in the vehicle.  In the exchange before the magistrate, Perry refers to both the dashcam and bodycam footage, and the officers' responses do not clearly distinguish between the two. But Officer Marko, the Government's subject matter expert, testified that neither officer had the ability on their own to preserve or "tag" the dashcam video at the time it was recorded on their vehicle hard drive.  They did have the ability to tag and preserve bodycam footage, and both of them took the appropriate steps to do so.

Officer Marko described the dashcam video system as "antiquated." Tr. of June 28, 2019 at 25. He stated that because of the aging system, general practice in the Norfolk Police Department has been to rely on bodycam footage, which is recorded in high definition and thus of better quality than the lower-resolution dash cameras. Id. at 28. Marko described the method of preserving dashcam video, which required intervention by a supervisor after the video had been uploaded to the department server. Id. at 18. Although the arresting officers could have requested preservation of the video through a supervisor, neither did so in this instance. Officer Miller testified that he was not aware of his ability to request preservation through a supervisor, and that after reviewing his bodycam footage, he did not believe preservation of the dashcam footage was necessary because his body-worn footage had captured the stop. Id. at 64, 66. Miller stated that in his time with the Norfolk police he had never requested preservation of dashcam footage. Id. at 64.

The second error which contributed to the loss of the dashcam video also appears to have been, at most, negligent. The state prosecutor who filled out the preservation request after Perry's attorney requested it checked only the box for bodycam footage. Her declaration states that her brief review of the file led her to conclude that only bodycam footage was available. As a result, she did not check the box for dashcam footage, and when her request

11

for preservation was processed, only the body camera footage was preserved. Collard Decl. 3 (ECF No. 35-3). As with Officers Para and Miller, the prosecutor had never seen the dashcam footage, nor any other video footage of the arrest, and thus had no information concerning its potential exculpatory value. Id.

A showing of bad faith sufficient to implicate due process concerns requires more than a simple failure to follow prescribed procedures. See United States v. Varner, 261 F. App'x 510, 518 (4th Cir. 2008). Bad faith is generally shown "when the police themselves by their conduct indicate that the evidence could form a basis for exonerating the defendant." Id. at 517 (quoting Youngblood, 488 U.S. at 58). Indeed, the Fourth Circuit has held that bad faith "requires that the officer have intentionally withheld the evidence for the purpose of depriving the plaintiff of the use of that evidence during his criminal trial." See United States v. Bloodworth, 412 F. App'x 639, 640 (4th Cir. 2011) (per curiam) (quoting Jean v. Collins, 221 F.3d 656, 663 (4th Cir. 2000)); see also United States v. Kennedy, 720 F. App'x 104, 109 (3d Cir. 2017) (finding no bad faith from the loss of dashcam video resulting from officer's failure to follow standard procedure); United States v. Deaner, 1 F.3d 192, 200 (3d Cir. 1993) ("While a showing that the Government did not follow standard procedure could provide some evidence of bad faith, we have not held that an improper procedure in and of itself implies bad faith"). The

undisputed evidence here establishes that the dashcam video was lost as a result of the Government's failure to follow standard procedures necessary to preserve it. But the same undisputed evidence establishes that none of the Government personnel involved in its loss were aware of what the dashcam video would reveal prior to its loss. The presence or absence of bad faith turns on the Government's knowledge of the apparent exculpatory value of the evidence before it was lost or destroyed. See Youngblood, 488 U.S. at 56-57. In addition, the fact that both Officers Miller and Para preserved the body camera footage, which they did control, indicates strongly that any part they played in the failure to act with respect to the dashcam footage was not in bad faith. See Bloodworth, 412 F. App'x at 640 (finding no bad faith when audio recordings of Defendant's arrest were automatically deleted by police software system). Moreover, as set forth below, that available bodycam video evidence, combined with testimony from the vehicle's other occupant, is sufficient other evidence to mitigate any prejudice to Perry from the loss of the dashcam footage.

**B. Perry has ample alternative evidence to address his status as passenger/driver of the vehicle.**

Even in cases where lost evidence raises due process concerns, no remedy is warranted unless the evidence is "of such a nature that the defendant would be unable to obtain comparable evidence

by other reasonably available means." <u>California v. Trombeta</u>, 467 U.S. at 489. On the facts before the court, Perry has ample alternative evidence with which to argue he did not occupy the passenger seat of McCarr's vehicle. Primarily, this is because he was not the only occupant of the vehicle, and the other occupant, Beatrice McCarr, his girlfriend, is available to testify to her observations regarding Perry's position in the vehicle. More importantly, Officer Miller's body camera footage begins while both vehicles are still in motion and captures a nearly identical view to the dashcam video. Indeed, when the vehicles come to a stop, the dash camera itself is visible in the Miller bodycam footage. Thus, for the relevant timeframe, it does not appear that the dash camera would have captured any additional footage not already preserved in Miller's body camera video.

Perry apparently contends the bodycam footage is insufficient alternative evidence because it neither confirms nor refutes the officers' testimony that they saw Perry in the passenger seat after the vehicles were stopped. Having reviewed the video, the court would agree with Perry's characterization that it is insufficiently clear to contribute much to the question of Perry's position prior to his exiting the vehicle on the driver's side. But this is due primarily to the time of night and the surrounding lights which do not permit a clear view inside the vehicle on the video. Nonetheless, from the time the police vehicle comes to a

14

stop until the time Perry exits the vehicle on the driver's side, Miller's body camera footage captures the entire scene, including the entire rear window of the McCarr vehicle.  Thus, there is no evidence that the lost dashcam footage would have revealed anything more than Miller's body-worn camera.  In fact, Officer Marko testified that Norfolk officers' bodycam footage is preferred over the dashcam footage because the dashcams are antiquated, recording at a lower resolution.  Tr. of June 28, 2019 at 28.

Finally, Perry's own statements suggest that while he had been occupying the driver's seat, he moved to the passenger seat after the vehicle stopped.  Miller Bodycam No. 8 at 18:50 to 19:10. According to this exchange, Perry apparently intended to switch places with McCarr, who he states had been in the passenger seat but opened the door and moved to the driver's side.  Id.  Having considered this admission by Perry, both officers have now testified that it is possible that Perry was not driving the vehicle and thus the issue of who was driving the vehicle prior to the stop may not be material at trial in any event.  If it becomes relevant, Perry's counsel will have access to the officers' previous inconsistent statements, which he may use to contest their memory and observations.  Likewise, the availability of the Miller bodycam footage, and its limited view of the inside of McCarr's vehicle, would also support Perry's attack on the officers' ability to see him inside the vehicle or any movements he might have made

15

in it prior to exiting on the driver's side.   Thus, while Perry's motion suggests that the lost footage from the older, less precise dash camera would have somehow produced a clearer view inside the vehicle, his argument is entirely speculative and insufficient to warrant dismissal of Count I, in light of the other available evidence.[5]

## C.   Alternative remedies for the lost evidence are not properly before the undersigned for resolution.

Perry's motion is styled a Motion to Dismiss Count I and largely urges dismissal as the only appropriate remedy for the due process violation he alleged.   Nevertheless, in a footnote his brief suggests various alternative remedies, such as limiting the officers' testimony, or instructing the jury regarding the lost evidence.   Br. Supp. Mot. to Dismiss 16, n.4 (ECF No. 32).   Because this Report finds no violation of due process, it is unnecessary to evaluate these alternative remedies.   As set forth above, it is not clear that the Government will even contend at trial that Perry was in the passenger seat of the vehicle before the stop.   And third-party testimony by Beatrice McCarr as well as the ultimate

---

[5] It also bears mention that Perry's position in the vehicle is only one piece of evidence linking him to the firearms.   McCarr stated during the stop and apparently testified before the Grand Jury that the guns belonged to Perry and evidence recovered from his phone also links him to both weapons.   Br. Opp. Mot. to Dismiss Ex. 5 (ECF No. 35-5).

admissibility of Perry's cellphone evidence will significantly affect the issues which could have been addressed by the lost dashcam footage.   Thus, the question of whether any type of instruction regarding the lost video would be warranted is better resolved by the trial judge after de novo review of this recommendation.   Once the Government has disclosed its witnesses and proposed exhibits, and the court receives evidence at trial, the need for any less drastic curative measure can be argued and evaluated on the complete record.   See United States v. Bakhtiar, 994 F.2d 970, 976 (2d Cir. 1993) (sanctions for government loss of evidence "should be tailored to redress for any resulting harm to the defendant").

## Conclusion

For the foregoing reasons, the undersigned recommends that Perry's Motion to Dismiss Count I of the Superseding Indictment (ECF No. 32) be DENIED.

## Review Procedure

By copy of this report and recommendation, the parties are notified that pursuant to 28 U.S.C. § 636(b)(1)(C):

1.   Any party may serve upon the other party and file with the Clerk written objections to the foregoing findings and recommendations within fourteen (14) days from the date of mailing of this report to the objecting party, see 28 U.S.C. § 636(b)(1), computed pursuant to Rule 6 (a) of the Federal Rules of Civil

Procedure. Rule 6(d) of the Federal Rules of Civil Procedure permits an extra three (3) days, if service occurs by mail. A party may respond to any other party's objections within fourteen (14) days after being served with a copy thereof. See Fed. R. Civ. P. 72(b)(2) (also computed pursuant to Rule 6(a) and (d) of the Federal Rules of Civil Procedure).

2.   A district judge shall make a de novo determination of those portions of this report or specified findings or recommendations to which objection is made.

The parties are further notified that failure to file timely objections to the findings and recommendations set forth above will result in a waiver of appeal from a judgment of this Court based on such findings and recommendations. Thomas v. Arn, 474 U.S. 140 (1985); Carr v. Hutto, 737 F.2d 433 (4th Cir. 1984); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984).

                                    /s/
                          Douglas E. Miller
                          United States Magistrate Judge
                          _____
                          DOUGLAS E. MILLER
                          UNITED STATES MAGISTRATE JUDGE

August 19, 2019