```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE EASTERN DISTRICT OF VIRGINIA
 2                     Norfolk Division

 3

 4  - - - - - - - - - - - - - - - - - - -
                                        )
 5    UNITED STATES OF AMERICA,         )
                                        )
 6    v.                                )   CRIMINAL ACTION NO.
                                        )   2:18cr113
 7    ADONIS MARQUIS PERRY,             )
                                        )
 8          Defendant.                  )
                                        )
 9  - - - - - - - - - - - - - - - - - - -

10

11

                    TRANSCRIPT OF PROCEEDINGS
12
                       Norfolk, Virginia
13
                       March 11, 2020
14

15

    BEFORE:  THE HONORABLE REBECCA BEACH SMITH
16           United States District Judge

17

18
    APPEARANCES:
19
             UNITED STATES ATTORNEY'S OFFICE
20           By:  William B. Jackson
                  Joseph DePadilla
21                Assistant United States Attorney
                  Counsel for the United States
22

23           RIDDICK BABINEAU PC
             By:  Jon M. Babineau
24                Counsel for the Defendant

25
```

JODY A. STEWART, Official Court Reporter

1          (Hearing commenced at 3:05 p.m.)

2          THE CLERK:  In case 2:18cr113, United States of

3  America versus Adonis Marquis Perry.

4          Mr. Jackson, Mr. DePadilla, is the government ready

5  to proceed?

6          MR. DePADILLA:  The government is ready.

7          THE COURT:  Good afternoon.

8          MR. DePADILLA:  Good afternoon.

9          THE COURT:  Mr. Babineau, is the defendant ready to

10  proceed?

11          MR. BABINEAU:  I am ready to proceed.

12          THE COURT:  Good afternoon, Mr. Babineau.

13          Let the record reflect that the defendant, Adonis

14  Marquis Perry, is here in person for the hearing.  There are

15  a number of matters that have come before the Court this

16  afternoon, and I'll take them in the order that they have

17  been filed.

18          The first was the defendant's motion filed by

19  counsel, Mr. Babineau, to inquire, and a motion on behalf of

20  the defendant to appear at the jury trial in jail clothes

21  and restraints.  That was filed on February 12th, 2020.

22          Then there was defense counsel's motion to withdraw

23  filed on March 5, 2020, and the defense counsel did file a

24  motion to seal the motion to withdraw.  The Court left the

25  motion to seal and the notice under Rule 49 notice on the

1    public docket, and there was no response and no objections,

2    and the order was entered earlier today.

3         So we are here before the Court on these motions,

4    and the first motion that the Court will take up, I'll do

5    the motion to inquire together with the motion to withdraw.

6    The first motion would be the motion that you filed,

7    Mr. Babineau, on the defendant's behalf for him to appear at

8    jury trial in jail clothes and restraints.  It requests that

9    he wants the, "...jury to be aware of his custodial status."

10   That's ECF number 137, which is the motion, and that's at

11   Page 1.

12        The government has taken no position on the motion

13   but requests that the defendant himself put his request on

14   record at the hearing, and that the Court, while the

15   defendant is under oath, putting his request on the record,

16   remind him that this will not be a grounds for reason of

17   reversal in later proceedings, and that is pursuant to

18   *Duarte v. United States*, 81 F.3d 75 at 77.  That's a Seventh

19   Circuit 1996 case.  In other words, the defendant can't make

20   a request and then make his request, which he has verified

21   and pursued under oath, a point of reversal in later

22   proceedings.  That would be stressed to the defendant.

23        The way we will proceed on this motion is, the

24   first thing that I'll do, after making it more of a

25   statement, is to allow Mr. Babineau to present why he filed

1    the motion and the discussions in this regard.  It's a

2    public motion to the Court, and then the Court will, if

3    appropriate, place Mr. Perry under oath and verify that he

4    does wish to appear at trial in his jail clothes.  The

5    restraints are another matter, but I will take that up with

6    him.

7          MR. BABINEAU:  Yes, ma'am.  In filing that motion,

8    I met with Mr. Perry a number of occasions in the Western

9    Tidewater Regional Jail to review his case, the discovery in

10   his case, and prepare him for trial, which is scheduled the

11   end of this month.

12         THE COURT:  Yes, it is, Tuesday, the 31st.

13         MR. BABINEAU:  So in discussing the trial with him

14   and kind of the indices of trial, I advised him that I was

15   trying to find out what size shirt and pants, shoes, jacket

16   he wore so that I could make sure that I provided him with

17   clothing.  I have clothing from lots of other clients who I

18   have represented and I've purchased in the past that I have

19   available, or I could reach out to his family, was the other

20   option I said to him, that I would either buy him the

21   clothes in order to have him properly dressed before the

22   Court, before the jury, or I could reach out to his family.

23         He became very angry with me relative to that topic

24   and was adamant about the fact that he wanted to appear in

25   jail clothes and shackled because he wanted the jury to know

1    what the government has done to him, and that he is not a

2    free man.  He doesn't want to give people the, his quote,

3    allusion that he is free when he is not free.  I explained

4    to him, obviously, what I felt my opinion was on that and

5    that I didn't think that was a great idea, but even

6    notwithstanding that, and this happened on at least two

7    conversations that we had, he was adamant about me filing

8    the motion, so I did.

9           THE COURT:  Thank you.

10          Mr. DePadilla, is there anything you want to add

11   before the Court addresses Mr. Perry on the motions?

12          MR. DePADILLA:  No, Your Honor.  Thank you.

13          THE COURT:  We need to place Mr. Perry under oath.

14          (Defendant was sworn.)

15          THE COURT:  Mr. Perry, the Court needs to make a

16   direct inquiry of you to be sure that the motion and the

17   representations that have been made to the Court you agree

18   with them.  You've heard what Mr. Babineau has said, that

19   you wish to appear at your trial in your jail clothing as

20   well as in the restraints.  Is that correct?

21          THE DEFENDANT:  No.  I never even seen any of those

22   documents.  I don't have any documents to work with.  I

23   didn't even know what I was coming to court for today.  I

24   don't have no documents.  I haven't seen none of these

25   documents.

```
1              THE COURT:  Well, let's approach it this way.  It's
2    been represented to the Court that you want to appear at
3    your trial in your jail clothing and in your restraints.  Is
4    that correct?
5              THE DEFENDANT:  I never said anything about being
6    in restraints.
7              THE COURT:  Well, then, let's look at the jail
8    clothing.  Do you wish to appear in your jail clothing?
9              THE DEFENDANT:  Why wouldn't I?  I am.
10             THE COURT:  You can appear in your jail clothing,
11   the law allows that, but you also can appear in civilian
12   clothing.  Which do you wish to appear in before the Court?
13             THE DEFENDANT:  What would be the difference?
14             THE COURT:  It's before the jury.
15             THE DEFENDANT:  Is it going to make any difference?
16             THE COURT:  Sir?
17             THE DEFENDANT:  What is going to make any
18   difference?
19             THE COURT:  I don't answer the questions.  It's up
20   to you.  In other words, you have discussed this with your
21   attorney whether you want to appear in jail clothing or in
22   clothing that would be provided for you through your family
23   or through an attorney or through the Court.  It's your
24   decision whether you wish to appear in jail clothing or in
25   civilian clothing.  If you don't make a decision, then you
```

1   will appear in civilian clothing unless you opt to appear in

2   your jail clothing.

3           THE DEFENDANT:  What do you mean?

4           THE COURT:  Just what I said.  I say what I mean,

5   and I mean what I say.

6           THE DEFENDANT:  Well, like I said, I don't

7   really -- he filed the motion.  I didn't even know anything

8   about that.  I don't even have a copy of it.

9           THE COURT:  Well, even assuming that you don't have

10  a copy of it, I'm telling you that you have a jury trial

11  coming up March 31.  There will be a jury seated in this

12  jury box, and you can appear before them in jail clothing,

13  if that's what you determine to do, it is permissible under

14  Supreme Court law, or you can appear in street civilian

15  clothing either provided through the Court or your attorney

16  or your family.

17          THE DEFENDANT:  If I'm in handcuffs and shackles,

18  how am I going to go over the documents with my case?

19          THE COURT:  You're not going to be in handcuffs

20  because if you don't request that, the Court isn't even

21  going to consider it.  In any event, I would tell you that

22  restraints is not viewed necessarily as a waivable right by

23  you.  In other words, you're not going to appear in

24  handcuffs.  I'm not going to allow that you appear in

25  handcuffs before the jury or in open shackles.  I'll give

```
1   you the Supreme Court law on that.  That's not the question
2   I'm asking you.
3           THE DEFENDANT:  Well, I really don't know what is
4   right.
5           THE COURT:  You have to speak up.
6           THE DEFENDANT:  This right here in this jumpsuit.
7           THE COURT:  What?
8           THE DEFENDANT:  I want to wear the jumper right
9   here.  I want to wear the jail issued clothes.
10          THE COURT:  So you want to wear, for your trial,
11  jail-issued clothes?
12          THE DEFENDANT:  Yes, ma'am.
13          THE COURT:  You understand that you will be
14  provided, if you wanted to, street clothes, civilian
15  clothes?  Do you understand that?
16          THE DEFENDANT:  Yes, ma'am.
17          THE COURT:  Do you understand that your attorney,
18  Mr. Babineau, advises against you appearing in jail
19  clothing?  He just said that at the podium.
20          THE DEFENDANT:  Yes.
21          THE COURT:  It is your election to appear in the
22  current jumpsuit, or one like it, in your jail jumpsuit at
23  your trial?
24          THE DEFENDANT:  Yes, ma'am.
25          THE COURT:  Let me ask you this.  Now, you know
```

1    that you will not be permitted to use your decision to

2    appear in your jail jumpsuit as a cause for reversal in any

3    later proceedings?

4              THE DEFENDANT:  Yes, ma'am.

5              THE COURT:  Do you have any questions about your

6    decision to appear in your jail jumpsuit?

7              THE DEFENDANT:  No, ma'am.

8              THE COURT:  Thank you.

9              Is there any further inquiry, Mr. Babineau, you

10   want the Court to make of the defendant in this regard, his

11   jail jumpsuit?

12             MR. BABINEAU:  No, ma'am.

13             THE COURT:  Mr. DePadilla, is there any further

14   inquiry you want the Court to make of the defendant about

15   his election to appear in his jail jumpsuit?

16             MR. DePADILLA:  No, Your Honor.  Thank you.

17             THE COURT:  I will approve and grant the motion

18   that has been filed on the defendant's behalf and his

19   election here in court that he be able to appear in his jail

20   clothes, i.e., his jail jumpsuit.

21             The Supreme Court has recognized that appearing in

22   jail clothes is, "Not an uncommon defense tactic," and that

23   while the Court has indicated that he "can't be compelled to

24   stand trial in a jail garb," it has been said that there is

25   no constitutional violation if the defendant, who has

1    received the proper advice of counsel and/or the Court fails

2    to object about being tried in his jail clothes, and here

3    it's not an objection to being tried in the jail clothes,

4    it's an absolute request under oath from the defendant.

5         The Supreme Court case that is on point is *Estelle*

6    *v. Williams*, 425 U.S. 501.  It's discussed around Page 508

7    through 512.  It is well-established Supreme Court

8    precedent.  It was issued in 1976.  So, consequently, this

9    is not only someone who was brought into court for a jury

10   trial in jail clothing, this is someone who actually request

11   that they be tried in jail clothing.

12        I find that there is no constitutional violation,

13   that the defendant has been informed that he does not have

14   to appear in the jail clothing, that he has an option to

15   appear in civilian street clothing, and that it will be

16   provided for him.  Under oath he has elected to proceed to

17   trial in his jail clothes, i.e., his jumpsuit.

18        In contrast, I will further rule, so that it's

19   clear, in regard to his restraints, in contrast to the

20   clothing issue, appearing without restraints is not viewed

21   as a right that is waivable by the defendant.  Instead,

22   actually shackling, this is in front of the jury, is, at a

23   threshold level, "Inherently prejudicial" and as such is

24   only permitted "where justified by an essential state

25   interest."  That's the Supreme Court case of *Holbrook v.*

1    *Flynn*, 475 U.S. 560, that is discussed at 568 to '69.  It is

2    a 1986 case.

3          Obviously, in a case such as this, at least for the

4    handcuffs, if there does come a point where Mr. Perry is

5    either proceeding *pro se* or with standby counsel, it will be

6    difficult for him to proceed with access to the podium,

7    documents, and so forth, and the Court recognizes this.

8          Accordingly, the Court does not permit at this

9    juncture him to appear in restraints or shackling, visible

10   restraints to the jury.  The only way that that could be

11   overruled is there appears to be "...an essential state

12   interest" that is set out in *Brewster v. Bordenkircher*, 745

13   F.2d at 913.  It's discussed at Page 916.  It's a 1984

14   Fourth Circuit case.

15         However, there are also matters in the law that

16   says that a defendant who has a history of any type of

17   violent outbursts and threats, both in and out of court,

18   that the Court should seek the marshal's advice.  The case

19   law says that the Court is entitled to "rely heavily on it."

20   That, again, is in *Brewster v. Bordenkircher*, the Fourth

21   Circuit case, and, obviously, given the history before this

22   Court of this defendant, the Court will be making inquiry

23   with the marshals about the proper security measures that

24   are required, and if those measures then aren't adequate,

25   then it will depend upon the measures recommended by the

1   marshal service, and the Court will go forward in that

2   regard, whether some type of restraints are suggested.

3          There are restraints that can be put on a defendant

4   that are not visible to a jury, such as the bandit device

5   and other ways that the defendant, if they have the history

6   that this defendant has, can be properly restrained for

7   security purposes of the court, and when I say the court, I

8   mean the attorneys, the court personnel, the marshals, and

9   the integrity of the trial.

10         The Court always has to be concerned about the

11  integrity of the trial, and that becomes an essential state

12  interest, the integrity of the trial.  So while at this

13  juncture I am ruling that he will not be in any type of

14  visible handcuffs or shackles before the jury, that the

15  Court will discuss and inquire with the marshals and "rely

16  heavily" on the marshal's advice and how to proceed in front

17  of the jury.

18         So that is the Court's ruling in terms of him

19  wearing what he is wearing today, the visible handcuffs and

20  shackles, which the marshals recommended for today's

21  proceeding, and that is the way we have proceeded today, but

22  it is not before the jury.

23         So that takes care of the appearance, allowing him

24  to appear in his jumpsuit before trial, not having handcuffs

25  and leg irons or shackles on him, and, again, the Court will

1    proceed to make appropriate measures that will secure the

2    integrity of the trial process itself as well as the safety

3    of any other individual in the courtroom.

4              That brings us to the motion to inquire and the

5    motion to withdraw.

6              Mr. Babineau.

7              MR. BABINEAU:  Yes, Your Honor.  The motion to

8    inquire was, obviously, filed prior to the motion to

9    withdraw.  The motion to inquire was also based upon

10   discussions between myself and Mr. Perry as to how to

11   proceed with the trial.

12             As the Court knows, he has had three lawyers prior

13   to me.  I think it was Mr. Grindrod, Mr. Woodward,

14   Mr. Hobbs, and then myself.  Mr. Perry expressed displeasure

15   with the way in which I propose to handle the trial of the

16   matter, advising me that the same was with his prior

17   counsel, and the advice that they were giving him, he did

18   not agree with their advice, and that he wanted to, quote,

19   fire me.

20             I advised him that there may be another option, or

21   that the Court would consider that would be his right and

22   that would be for him to represent himself at trial with

23   standby counsel.  At the time I put in the motion that would

24   have been appropriate for me to at that time to remain as

25   standby counsel because I didn't believe our relationship

1    had deteriorated to the point it had in the filing of the

2    final motion in regard to my motion to withdraw.

3          But he did advise me that if nobody was going to

4    help him, like nobody had, quote, that he wanted to

5    represent himself.  I advised him, again, about standby

6    counsel, and he seemed to be accepting of that.  So, hence,

7    I filed that motion at the same time I filed the other

8    motion relative to the jumpsuit, which the Court has

9    addressed.

10         Want me to address the motion to withdraw, Judge?

11         THE COURT:  Yes.  Go ahead.

12         MR. BABINEAU:  Yes, ma'am.  So after going to the

13   jail on a number of occasions, Western Tidewater Regional

14   Jail, probably somewhere in the neighborhood of about eight

15   times or so in reviewing the case with Mr. Perry, including

16   the discovery and the information that I received from

17   potential witnesses in the case who he had asked me to

18   subpoena a couple of whom, or three of whom I had

19   interviewed, on March 3rd, when I appeared at the jail as

20   contained in the motion that's been filed, discussing with

21   him the case, he erupted into a violent outburst, yelling

22   extremely loudly, like you could probably hear him outside

23   this courtroom today if you were out on the sidewalk, and

24   exhibiting extremely violent behavior, striking the wall and

25   then the glass repeatedly with the receiver of the

1    telephone.

2          The corrections officers, during the visit, who

3    came by and told him on at least two occasions to lower his

4    voice and calm down, there were other folks back in the

5    panel areas, and he did not.  He just became more violent

6    and louder and pacing around within the room until the

7    outburst, in which he advised me that I was not going to be

8    his lawyer, that I would not be around to be his lawyer,

9    that he would make sure that I was taken out.

10         THE DEFENDANT:  He lying, Judge.

11         MR. BABINEAU:  Then two correctional officers, a

12   captain and another corrections officer came into the room,

13   not at my calling but because of the outburst and him

14   hitting the receiver against the glass -- I was on the other

15   side of the glass -- they forcibly removed him.

16         Subsequent to that, about three or four hours later

17   I received a phone call from the United States, Assistant

18   United States Attorney William Jackson, advising that agents

19   had listened to a phone conversation from the jail to one of

20   Mr. Perry's family members in which he advised the caller

21   that he was going to "F" me up.

22         As a result of that, I contacted the Virginia State

23   Bar, made inquiry from them as related to ethical matters

24   that would be of concern as a result of that conversation.

25   In my belief, I had an affirmative duty to report what I

1    believe to be, given his history, his characteristics, his

2    violent gang affiliation, that I needed to notify law

3    enforcement, which I did, and I notified the United States

4    Marshal Service, and I also notified the homicide violent

5    crimes lieutenant, Lieutenant Shaun Squyres, Norfolk Police

6    Department, who was in touch with the gang squad and others,

7    and as a result of his statements, I perceived them as a

8    real threat to my safety and security, and as such I'm not

9    in a position, because of the adverse situation that I'm in

10   with Mr. Perry at this point in time, I am not able to

11   represent him.

12        I, quite frankly, Judge, I don't wish upon anyone

13   to sit next to him.  I think he's violent, and somebody is

14   going to get hurt, and that would be on my mind the whole

15   time.  I would not be in position to help him in his case.

16        THE COURT:  That would be even as standby counsel

17   at this juncture?

18        MR. BABINEAU:  Even as standby counsel at this

19   point, Judge.  I've done a lot of soul-searching on it

20   because I want everyone to have a good defense.  I've been

21   doing this for 32 years, as the Court knows, a long time

22   before Your Honor, this is the first time I've been put in

23   this situation in state court or Federal Court.

24        THE COURT:  Mr. DePadilla, is there anything you

25   want to say before I inquire of Mr. Perry?

1           MR. DePADILLA:  No, Your Honor, not at this time.

2           THE COURT:  I think if you can get the microphone

3    to Mr. Perry, he can stand there at the table.

4           THE DEFENDANT:  Well, Your Honor, as he say, he

5    came to the jail a few times and visit with me.  I'm not

6    disputing the facts of what he said about pertaining to the

7    visits with me about my case and certain documents involving

8    my case and the case strategy or whatnot.

9           Some of the documents that I asked that I know for

10   sure have been filed with the clerk of court to this court,

11   I don't have them in the motion discovery.  He doesn't even

12   have the full motion discovery.  He doesn't even have the

13   videotape.  He got a blank DVD of the crime scene, the

14   officer's body cams.  It is a blank DVD.  I haven't even

15   been able to go over all the facts of the case with

16   Mr. Babineau at all.  Certain documents that I asked him

17   for, he hasn't been able to produce.

18          Like I said, I'm not disputing the fact of my

19   conversation with Mr. Babineau -- how can I put this?  It

20   might not have had went that way, but I never, in no form,

21   ever threatened Mr. Babineau to his face, told him that I

22   was going to do anything to him or sent somebody to get him

23   or something, you know what I'm saying.

24          I might have been mad when I talked on the phone

25   and said, you know what I'm saying, I would do something to

1   him, but I never told him that I would, you know what I'm
2   saying, get somebody to do something to him or nothing at no
3   time.  That is a lie.
4           Like I said, he wanted me to agree to certain
5   stipulations that I wasn't -- I didn't see fit to agreeing
6   to at my upcoming trial, and I opposed to it, and I told
7   him, and that's where we didn't see eye to eye on.  But,
8   like I said, he didn't even produce the full motion
9   discovery yet, so I don't -- you know what I'm saying, there
10  is a lot of things missing out of there that I don't have,
11  you know what I'm saying.
12          When I left the office with him that day, when I
13  left that visit with him that day, I tried to contact my old
14  lawyer that I knew filed these documents, which was Andrew
15  Grindrod, but he told me he couldn't help me, but he filed
16  them via the computer electronically, so they are part of my
17  motion discovery.  But, as I said, I have yet to receive
18  these documents.
19          THE COURT:  Well, there are a number of things,
20  Mr. Perry, that you need to be aware of.  Number one, at
21  this juncture, and when you were with Mr. Babineau, you are
22  not the lawyer, and you do not run the case.  The lawyer is
23  there to make decisions and to file motions and to proceed
24  with the defense.  So it's not you running the case; it's
25  the lawyer running the case.

```
1              You have a lengthy history now with the Court.
2     This is the fourth attorney.  Your statements here defy
3     credibility that you haven't seen the documents in your
4     case, because you've had four lawyers.  Mr. Grindrod was the
5     first lawyer.  He passed the file on to Mr. Woodward who
6     passed the file on to Mr. Hobbs who's passed the file on to
7     Mr. Babineau.
8              THE DEFENDANT:  I understand all that.
9              THE COURT:  Each of those attorneys have gone
10    through things with you and then reached a point where you
11    have your outburst and made it such that they could not
12    communicate with you.
13             THE DEFENDANT:  No, ma'am.
14             THE COURT:  Mr. Perry, Mr. Perry, you may not
15    overtalk the Court.
16             THE DEFENDANT:  Yes, ma'am.
17             THE COURT:  I'll give you a chance to talk, but you
18    may not overtalk the Court.  I am telling you that there is
19    a record here.  There is a history here.  There have already
20    been four attorneys.  Each of those attorneys have come very
21    close up to trial.  You have been afforded legal
22    representation, and, as I said, you are not the lawyer.
23    There have been no stipulations filed against your wishes
24    here with the Court.  So whatever wishes you have expressed
25    to your attorneys, there have been nothing filed here.
```

1          THE DEFENDANT:  That's because he ain't filing.  He

2     ain't filing nothing I asked him to file.

3          THE COURT:  There are no stipulations.  I said do

4     not talk over me, please.  There are no stipulations filed,

5     and what you're saying, just again, tells the Court that

6     you're not going to listen to your lawyers.

7          THE DEFENDANT:  You didn't even ask him if anything

8     that I said was true or factual.  You didn't even ask him.

9     I'm telling you, he has a chance to speak up right now about

10    everything I just said.

11         THE COURT:  I'm going to let him respond,

12    Mr. Perry, but you were responding.  I asked you to respond,

13    and I'm telling you your history with the Court defies what

14    you are saying, and you've had four attorneys.  You've been

15    through motions to suppress.  I know you have seen the tape.

16    I know that the tape is there.

17         THE DEFENDANT:  Yeah, but all my notes, when they

18    sent me to Butner, they shredded all my documents.  They

19    shredded all my documents.  And I know from ever since

20    Andrew Grindrod has not been my attorneys, all the

21    documents, on the motion to discovery, is some documents

22    that's missing, and I been asking him about them.  I know

23    they, in fact, they exist.  I want those documents.  I'm

24    obligated to have them, right?

25         THE COURT:  What I'm telling you is that the Court

1  cannot overlook the fact of the history of this case, the
2  fact that the Court knows that you have seen the tape, the
3  Court knows that you have reviewed the tape with at least
4  two of your attorneys.
5          THE DEFENDANT:  One.
6          THE COURT:  Okay.  So who did you review it with?
7          THE DEFENDANT:  Andrew Grindrod.  That was the only
8  lawyer I ever reviewed it with.  After Andrew Grindrod was
9  taken off my case, when Woodward retained -- when Woodward
10 became my attorney, I was sent to Butner.  They took all of
11 my documents.  They took my whole case file, and they
12 shredded it.  That is what I'm telling you.  Certain
13 documents that I know that should be in my motion to
14 discovery isn't there, and I have been asking for them the
15 whole time that Nicholas Hobbs was my attorney, that
16 Lawrence Woodward was my attorney, and John Babineau, the
17 whole time.
18         THE COURT:  I will let the record speak for itself.
19 There were motions to suppress that were continued under
20 Mr. Woodward.  It is a matter of fact and record in this
21 court that the tape has been discovered.  The tape has been
22 reviewed in court and with the defendant.  The motion to
23 suppress has been heard, and I know there were two motions
24 to suppress.  They were heard.  They were heard by Judge
25 Miller, and then they became before this Judge on review,

1    and they have been upheld.  We are not going to revisit

2    motions to suppress.  We are not going to revisit evidence

3    that the Court knows the defendant has reviewed.

4              THE DEFENDANT:  Judge.

5              THE COURT:  If you keep talking over me, I'm going

6    to have to take appropriate measures, Mr. Perry, because the

7    Court has to rule.

8              THE DEFENDANT:  Yes, ma'am.

9              THE COURT:  You are not entitled to talk over the

10   Court.

11             THE DEFENDANT:  Yes, ma'am.  But --

12             THE COURT:  You are not entitled to talk over the

13   Court.  As the Court was saying, his allegations defy the

14   record in this case, and I would advise you, Mr. Perry, we

15   will get to your representation in a moment, but the Court

16   will not tolerate a manipulation of the court system or the

17   integrity of a jury trial and continued antics and conduct

18   that are becoming historical in nature now over the long

19   time period that this case has been pending now.  I believe

20   it was originally filed in July of 2018.

21             We are on the second superseding indictment.  We

22   are on the fourth attorney, and each attorney is moving to

23   withdraw because of, at this point, his inability to

24   maintain any type of decorum and relationship with the

25   defendant, including Mr. Grindrod who moved to withdraw as

1     counsel from this case.

2          So I'm just stating that as a matter of record, and

3     I have heard you, Mr. Perry, and you may be seated.

4          Mr. Babineau.

5          THE DEFENDANT:  The record will speak for itself,

6     though.

7          THE COURT:  Any response you want to make to the

8     defendant?

9          MR. BABINEAU:  Just that I have a quite voluminous

10    amount of discovery that I received passed down from lawyer

11    to lawyer to lawyer, including a box that I received that I

12    received from Mr. Hobbs which had notes going back to

13    Mr. Grindrod and Mr. Woodward.

14         So I have, I believe, a complete file.  I just

15    fully discussed the suppression hearings, the rulings and

16    the suppression hearing, the evidence that was going to be

17    admitted, as well as fully discussed the video and the need

18    to have Officer Para, Investigator Para subpoenaed for trial

19    in the case.  It was, as the Court may or may not know, as

20    Investigator Miller and Investigator Para were the two

21    Norfolk police detectives who had the traffic stop.

22         THE COURT:  I'm well aware.  I reviewed the video.

23         MR. BABINEAU:  I'm sorry, Judge.  I keep thinking

24    Judge Miller.  Judge Miller conducted the hearing, but you

25    reviewed it.  I apologize.  That Para, Investigator Para was

1    found maybe to be less than truthful in the testimony that

2    he offered to the Court, but there was evidence and

3    testimony from Para, as well as electronic evidence that was

4    being admitted through the cell phone, and so I discussed

5    all of that at great length, the case law associated with

6    that, the reason for the superseding indictment relative to

7    the firearm by felon with the Supreme Court ruling that

8    required an additional element that the person knew at the

9    time that he was a prohibited person by virtue of his felony

10   convictions.

11        So we discussed that going into the jail on March

12   3rd.  Prior to going into the jail, I spent -- Mr. Jackson

13   will correct me if I'm wrong -- but probably 20 minutes on

14   the telephone with him discussing a number of matters,

15   including a stipulation related to the fact that he was a

16   convicted felon so the jury would not hear the extent of his

17   felony record or see any felony sentencing order that may

18   otherwise be introduced into the trial of the case.

19        So the government was willing to enter a

20   stipulation that would just say he was a convicted felon

21   without more, which I told him was great for us because,

22   clearly, they could prove he was a convicted felon, but we

23   certainly didn't want the jury to know about the nature and

24   the extent or the number of felonies because I think the

25   government might be able to introduce more than just the one

1   felony into the record in the case.

2            So we did talk about that, as he mentioned.  So

3   responding to that, I also asked United States Attorney

4   Jackson about providing some audit information or some other

5   body cam detail relative to officers that may have been at

6   the traffic stop, including Para and Miller, if there was

7   any detail related to times when the cameras were turned off

8   or otherwise, which is an issue that he has, he meaning

9   Mr. Perry, has raised with me.  He actually raised it in a

10  letter that was, I think, offered February 26 that I

11  received in my office on March the 2nd, prior to my meeting

12  with him on March the 3rd, and I had a conversation with

13  Mr. Jackson about that type of information on March the 3rd,

14  and I communicated that to Mr. Perry that I would be --

15  Mr. Jackson would be making the appropriate inquiries and

16  looking through what he had and would provide that

17  information, if it existed, as quickly as he could get his

18  hands on it.

19            In addition to that, I wanted to talk to him about

20  jury instructions because he had some, he, meaning

21  Mr. Perry, had some specific questions about jury

22  instructions, and so I asked Mr. Jackson in that same phone

23  conversation if he would forward jury instructions to me

24  because he had already prepared them since this case has

25  been prepared for trial for a long time and that the

1   government had already done jury instructions.

2         I asked him if they were standard book

3   instructions, if you will, and he said no, there were some

4   that had some nuances to them, and I wanted to be able to

5   see those and go over them with Mr. Perry because Mr. Perry

6   was concerned about jury instructions.

7         So he and I had some very fruitful, many very

8   fruitful discussions.  I don't go to the jail just to hang

9   out and chat with my clients.  I go there, it's work, it's

10  business.  I want to know as much about their case, and I

11  want to give them every bit of information they can.  Every

12  time he came to me, he never claimed he lost any notes or

13  anything of that nature.

14        In any regard, he came truly with two hands with

15  piles of paper.  He has transcripts of the proceedings.  He

16  has copies of the discovery.  He has -- would fill up a

17  banker's box of papers each time he came back and forth, and

18  sometimes I would tell him, "Tell him don't bring the

19  papers.  He and I are going to talk about some things that

20  we don't need the papers.  We are going to talk about some

21  case law and some other things."  So I would suggest that

22  his suggestion to the Court is inaccurate.

23              THE DEFENDANT:  Lying again.

24              THE COURT:  Mr. DePadilla, is there anything you

25  want to add to that?  I'm also going to ask Mr. Jackson to

1    verify what has been said, but is there anything you want to

2    add in response to either Mr. Babineau or Mr. Perry?

3          MR. DePADILLA:  Only, Your Honor, that over the

4    pendency of this investigation and prosecution, we have

5    worked with each one of Mr. Perry's attorneys.  When

6    Mr. Grindrod made requests, we got him information.  When

7    Mr. Woodward made requests, we got him information.  When

8    Mr. Hobbs became lawyer, we dealt with his requests.  At

9    every juncture the government has tried to give Mr. Perry

10   what he's wanted in this case.

11         As Your Honor fully pointed out, he's viewed the

12   tapes at the suppression hearing.  We played them *ad nauseam*

13   literally from the beginning of the traffic stop until the

14   last possible moment.

15         THE DEFENDANT:  It won't tapes from my attorney.

16   It was tapes from the prosecutor and from U.S. Government.

17         MR. DePADILLA:  As far as his latest request for

18   new body cam footage, we are now two years plus from the

19   time of the traffic stop.

20         THE DEFENDANT:  I don't want the body cam footage.

21   I want the audit.

22         THE COURT:  Do you have any body cam footage?

23         MR. DePADILLA:  No, Your Honor.  It would not be

24   maintained because you have to make a mark in the system to

25   save it for trial.  Since those weren't trial witnesses, and

1    we'd already turned over Para and Miller, and these hearings

2    had gone forward, no, there aren't any more tapes, to the

3    best of my knowledge.

4              THE DEFENDANT:  I don't want the tape.  I want the

5    audit.

6              THE COURT:  Mr. Perry, I'm going to give you a

7    chance to respond.

8              THE DEFENDANT:  Yes, ma'am.  I'm sorry.

9              THE COURT:  But I have to hear what Mr. DePadilla

10   is saying to the Court so I can be sure there is nothing

11   else out there that we can get to your attorney.

12             THE DEFENDANT:  Yes, but he's mistaken.  I don't

13   want the tape.  I want the audit.  I want the documents

14   saying how many times his video camera stopped, his axon

15   camera stopped, when did he cut it on, when did he program

16   it when he came on the shift.  I want the audit from it.

17             I have Officer Miller's, but I do not have Officer

18   Para where Officer Para testified to certain things at the

19   hearing, and I would like the audit from this camera.  I

20   would like that.

21             THE COURT:  Don't say anything else while I ask

22   Mr. DePadilla certain questions.

23             THE DEFENDANT:  Yes, ma'am.

24             THE COURT:  Now, Mr. DePadilla, let's get straight

25   on the cams and whatever you have.  I have seen the tapes

1    that were offered on the motion to suppress.

2            Now, are there any other body cams or tapes

3    available, let's say, video at this point?

4            MR. DePADILLA:  Right.  Based on our going back to

5    Norfolk, there are no more tapes that exist at this time.

6            THE COURT:  Now, are there any audio recordings?

7            MR. DePADILLA:  No, there are no audio recordings

8    either.  What Mr. Perry is asking for is what is called an

9    audit, a-u-d-i-t, trail, which the computer showing when the

10   body cam was on or off.  We will attempt to get Para's audit

11   for Mr. Perry.  I believe, if I may have one second to check

12   with Mr. Jackson.

13           THE COURT:  Wait just a minute.  Audit, a-u-d-i-t?

14           MR. DePADILLA:  Yes, Your Honor.

15           THE COURT:  I thought he was saying audio.  So it's

16   audit, a-u-d-i-t.  Do you have audit trails for the tapes?

17           MR. DePADILLA:  We do not current have one for

18   Para, but we do believe the computer will save that, at

19   least I can make that representation to the Court.  We

20   believe, based on the prior experience with Norfolk, that

21   would exist.  So we will go now and pull the audit and see

22   where he ends up with counsel so it can get to Mr. Perry at

23   some point.

24           But all that's going to show, Your Honor, is when

25   Officer Para's camera was on and off.  As Your Honor well

1   remembers, Officer Para's camera didn't start in a timely

2   fashion, right.  He's the officer whose camera doesn't come

3   on until five or six minutes into the traffic stop.  It is

4   Officer Miller's camera who is there the entire time taping

5   it, and that's what we are going to sponsor at trial,

6   Miller's cam.

7           THE COURT:  Let me ask you, let's go to Miller's

8   cam.  Miller's cam, there would be no audit trail?

9           THE DEFENDANT:  I got it.

10          THE COURT:  He has the audit trail?

11          THE DEFENDANT:  It stopped multiple times.

12          THE COURT:  So you've got the Miller body cam, the

13  video, and you've got the Miller audit trail, and those have

14  been produced to counsel?

15          MR. DePADILLA:  Yes, Your Honor, those have passed

16  over to the defense.

17          THE COURT:  Now, in terms of Officer Para, you have

18  turned over the body cam, and I know the issues about it

19  starting, but you have not turned over any audit trail, and

20  you need to inquire whether there is one?

21          MR. DePADILLA:  Yes, Your Honor.

22          THE COURT:  Have you been asked for an audit trail

23  before?

24          MR. DePADILLA:  May I ask Mr. Jackson because he

25  was working with Mr. Babineau.

```
 1              THE COURT:  Yes.

 2              MR. DePADILLA:  No.  This is the first time we have

 3     become aware of it so we will try and satisfy that request

 4     at this time.

 5              THE COURT:  So, in other words, you, in your

 6     discovery, didn't fail to turn over an audit trail, I want

 7     that to be clear, you did not have an audit trail?

 8              MR. DePADILLA:  No, Your Honor, we did not.  We are

 9     not going to sponsor Officer Para at trial based on what

10     happened in the suppression hearing.  But we will still

11     supply what the computer, if it exists.

12              THE COURT:  Just answer my questions.

13              MR. DePADILLA:  Yes, Your Honor.

14              THE COURT:  So we have a clear record.  Let's go to

15     Officer Para.  His body cam, we know the issues about it

16     starting late.  You did not fail to produce an audit trail

17     that you had?

18              MR. DePADILLA:  No, Your Honor, we did not.

19              THE COURT:  That needs to be clear for the record.

20              MR. DePADILLA:  Yes, Your Honor.

21              THE COURT:  So you didn't fail to produce an audit

22     trail that you had?

23              MR. DePADILLA:  That is correct, Your Honor.

24              THE COURT:  Is that correct?

25              MR. DePADILLA:  Yes, Your Honor.
```

1          THE COURT:  You think one exists, but you don't
2     know?
3          MR. DePADILLA:  I cannot make that representation
4     to the Court, but we will inquire if it does exist.
5          THE COURT:  Will have to probably be tomorrow since
6     we are already at 4:00 today, you will immediately inquire,
7     and you will inform the Court and whatever the state of
8     counsel is at that point in time?
9          MR. DePADILLA:  Yes, Your Honor.
10         THE COURT:  If it exists, you will get it and
11    produce it?
12         MR. DePADILLA:  Yes, Your Honor.
13         THE COURT:  Now, have you failed to produce it on a
14    request?  Has anybody requested it before now?
15         MR. DePADILLA:  No, Your Honor.
16         THE COURT:  So from Grindrod, none of the four
17    attorneys has requested that you look for audit trails of
18    Officer Para?
19         MR. DePADILLA:  Right.  That is correct, Your
20    Honor.
21         THE COURT:  So that needs to be clear for the
22    record.  In other words, an audit trail may or may not
23    exist.  If it does exist, you're going to ask for it and
24    produce it, if it does exist, and it is not something that
25    you have failed to produce upon a request from defense

1    counsel?

2         MR. DePADILLA:  That is correct, Your Honor.

3         THE COURT:  Is there anything else you want to add?

4         MR. DePADILLA:  No, Your Honor.

5         THE COURT:  Now, Mr. Jackson, if you could confirm,

6    you heard what Mr. Babineau represented to the Court about

7    discussions with you regarding stipulations.  Is there

8    anything you want to add or do you agree with him?

9         MR. JACKSON:  Nothing to add.  I agree with what he

10   said, represented about our conversations.

11        THE COURT:  I wanted to be clear, the government

12   then offered, at least in terms of stipulations, a

13   stipulation that everyone would agree he was a convicted

14   felon?

15        THE DEFENDANT:  No, I --

16        THE COURT:  I'm asking you, Mr. Jackson.  Is that

17   what the government offered?

18        MR. JACKSON:  Yes.  The stipulation was to him

19   being a convicted felon and to knowing of that prohibited

20   status.

21        THE COURT:  Consequently, you would not plan to

22   present the nature and extent of his criminal record?

23        MR. JACKSON:  Yes, Your Honor.

24        THE COURT:  Unless there is something else you want

25   to add?

1              MR. JACKSON:  Nothing else, Your Honor.

2              THE COURT:  Now, Mr. Perry, you can stand up there.

3    You've heard Mr. Babineau, he doesn't agree with what you've

4    said, and you've heard that Mr. Jackson does agree with what

5    Mr. Babineau said, and you've heard that Mr. DePadilla has

6    said they will endeavor to get an audit trail of Mr. Para.

7              THE DEFENDANT:  I understand that, but what I was

8    trying to tell you in the beginning is they never, since the

9    suppression hearing, that Lawrence Woodward never played the

10   DVD on Mr. Jackson.  He played the DVD, his DVD, his

11   recording, and the one that Babineau has, that Mr. Jon

12   Babineau has is blank, you know what I'm saying.  What I'm

13   saying is the audit from it, the time stamp, I had that for

14   Officer Miller.  That was entered into the record at that

15   suppression hearing.

16             But Officer Para's, you know what I'm saying, we

17   already know his testimony was fraudulent in itself, but let

18   alone I want the audit to, you know what I'm saying, to go

19   back and see whether the camera was on or off because we

20   don't know.

21             All we know is what he testified to, but we know

22   he's a liar so how can we believe anything that he says, you

23   know what I'm saying.  I'm not going to go off what he said.

24   I want the discovery.  I want the evidence.  I want the

25   evidence that back, you know what I'm saying.  When he came

1   and talked to me, like I said, I didn't discuss a lot of

2   different matters with Mr. Babineau as far as things that I

3   wanted to be filed, you know what I'm saying.

4          For, one, I don't see how the USA could take all

5   these dispositions as to, like you said, we on the second

6   superseding indictment, you know what I'm saying.  You deal

7   with the facts and only the facts, but he can take how many

8   dispositions he want.  He can say, well, okay, I know this

9   dude ain't truthful, but I believe this and I don't believe

10  that.  I don't understand that, you know what I'm saying.

11         It was certain things that I wanted to be filed,

12  and, like I said, I talked to him numerous times, and he

13  just do what he want to do, know what I'm saying, not what

14  he should be doing, which is right, and, in fact, I never

15  argued with anything outside of the law, his job.  When he

16  say, well, I don't agree with you on this.  I said, well,

17  Mr. Babineau, can you show it to me?  Can you show me the

18  case law citing?

19         THE COURT:  Well, you've heard the discussion on

20  the audit trail, and that is going to be pursued.

21         THE DEFENDANT:  Well, am I going to get it?

22         THE COURT:  Wait just a minute, Mr. Perry.

23         THE DEFENDANT:  Am I going to get a copy of the

24  actual DVD?

25         THE COURT:  Wait just a minute, Mr. Perry.  You

1    have heard the discussion about the audit trail of Officer

2    Para.  It has not been requested before.  It has not been in

3    the United States' possession.  They think it may be in

4    Norfolk, and they will proceed to request it.  Where it goes

5    from there, we are not there yet.  The point is the audit

6    trail, your request has been heard, it has now been made,

7    and they are going to pursue it.

8              THE DEFENDANT:  Yes, ma'am.

9              THE COURT:  Now let's go back to the motion, and I

10   want you to understand, Mr. Perry, that you have been under

11   oath during this entire proceeding.

12             THE DEFENDANT:  Yes, ma'am.

13             THE COURT:  You understand that you're still under

14   oath?

15             THE DEFENDANT:  Yes, ma'am.

16             THE COURT:  Now, we are on to Mr. Babineau's motion

17   to withdraw as counsel.  That's what the Court has to decide

18   right now, is whether he withdraws as counsel and then what

19   occurs in terms of your representation.

20             I will not offer anything at this point other than

21   the Court has to determine on his withdrawal as counsel and

22   whether you proceed then *pro se*, proceed with new counsel or

23   proceed with standby counsel.  That's not before the Court

24   yet.  What is before the Court at this juncture is what

25   Mr. Babineau has represented that has occurred between the

```
 1   two of you.
 2            THE DEFENDANT:  Yes, ma'am.
 3            THE COURT:  That did not comfortably communicate
 4   with you and is not at all comfortable with representing you
 5   for the reasons that he said.
 6            THE DEFENDANT:  Yes, ma'am.
 7            THE COURT:  Do you agree with his motion to
 8   withdraw?
 9            THE DEFENDANT:  I mean, I don't oppose to it.  I
10   don't agree to what he testified to, but I don't oppose to
11   his motion to withdraw, no.  That's his position.
12            THE COURT:  Do you want him to represent you?
13            THE DEFENDANT:  No, ma'am.
14            THE COURT:  Because, I mean, he's not out of the
15   case unless I tell him he's out of the case.  Do you want
16   him to represent you?
17            THE DEFENDANT:  No, ma'am.
18            THE COURT:  So you agree with his motion to
19   withdraw as your counsel?
20            THE DEFENDANT:  Yes.  I don't agree with what he
21   testified to.  I don't agree with it.
22            THE COURT:  Are you getting along with
23   Mr. Babineau?
24            THE DEFENDANT:  I mean, at this point, um, he wants
25   out.  Like I said, everything that he said wasn't true, but
```

1    he want out.  Why would I go to trial with somebody who

2    don't want to be a part of it.

3            THE COURT:  Do you want him to be a part of your

4    case?

5            THE DEFENDANT:  No, ma'am.

6            THE COURT:  You may be seated.

7            Is there any further inquiry you want the Court to

8    make in regard to your motion, Mr. Babineau?

9            MR. BABINEAU:  No, ma'am.

10           THE COURT:  Any further inquiry that you want the

11   Court to make, Mr. DePadilla?

12           MR. DePADILLA:  No, Your Honor.

13           THE COURT:  Well, I first want to say on the record

14   that if the Court allows this motion, this will be the

15   fourth attorney who has moved basically on the same grounds

16   in some form to be relieved of counsel, the last three, in

17   particular, out of violent outbursts towards them and their

18   representations on the record, many of which are documented

19   through what occurred in lock-ups at the jail, and there

20   have been outbursts, obviously, in court.

21           What the Court wants to add to that at this point

22   is these are four of the best attorneys that appear before

23   this Court, and their longevity alone before the Court may

24   come close to a total of 100 years.  I don't know if you

25   start adding up the number of years that they have been

1    practicing.  Mr. Grindrod is an outstanding public defender.

2              THE DEFENDANT:  The best attorney I had.

3              THE COURT:  As are the attorneys in the public

4    defender's office.  Then you have Mr. Woodward, who I know

5    has at least 30 years of experience because I have been on

6    the bench over that period of time, and Mr. Hobbs, who may

7    not have 30 years, but he has a lot of years of experience

8    and appears regularly before the Court on criminal cases.

9              Mr. Babineau, who I know for a fact has appeared

10   for at least 30 years before the Court.  So that you've got

11   four of the most experienced attorneys, all of whom have

12   appeared repeatedly before this Judge, and all four of

13   which I don't know that they have ever -- they may have, but

14   if they have had a motion to withdraw from a case outside of

15   a conflict of interest, I don't recall any such motion.

16             So I'm going to put all of that on the record.  On

17   the other hand, the Court has to be aware of the right to

18   have counsel represent the defendant, and the Court has to

19   be aware of the communications that need to go forward

20   between counsel and the defendant.

21             I would first say that I do find Mr. Babineau

22   credible.  His representations before the Court have been

23   confirmed through the marshal service, with the jail, at

24   least in terms of the conduct, not necessarily the words but

25   the incident occurred, the phone call occurred, the

1    stipulations been confirmed through Mr. Jackson, and I have

2    never had Mr. Babineau or any attorney, frankly, say that

3    they didn't even want to sit at the table with the

4    defendant.

5            Consequently, the motion is semi-timely.  We are

6    still at least about three weeks from trial.  The Court has

7    inquired into the breakdown across the board, and the Court

8    would conclude that, again, this relationship is resulting

9    in a total lack of communication.  It appears that Mr. Perry

10   wants to be his own lawyer and run his own case and is not

11   going to agree with any attorney.

12           In any event, obviously, Mr. Babineau cannot

13   proceed, and he has represented that he just cannot present

14   an adequate and fair defense given his perceived seriousness

15   of the threats.  Basically his motion suggests, and he said

16   in court that it's impossible for him to present an adequate

17   or a fair defense given his perceived seriousness of the

18   threats and his feelings at this juncture about the

19   defendant.

20           So, consequently, I grant the motion to withdraw on

21   certain conditions.  Number one, it's not effective until I

22   enter the order or say the order is effective.  Obviously,

23   Mr. Babineau has to turn over all files to any new counsel,

24   and I will determine how that will be done, and given the

25   order, but you are not under any further obligation to me or

1    proceed with the case at this juncture, Mr. Babineau, with

2    Mr. Perry, but you are under your ethical duty as an officer

3    of the Court to maintain the file and turn it over as

4    directed by the Court.  Do you understand?

5            MR. BABINEAU:  Yes, ma'am.

6            THE COURT:  I will issue a written order that

7    relieves you of representation as of the conclusion of this

8    hearing except for your duties as an officer of the Court to

9    maintain the file and see that it is properly preserved and

10   turned over to new counsel or as appropriate who the Court

11   orders.

12           MR. BABINEAU:  Yes, ma'am.

13           THE COURT:  You, obviously, have to stay for the

14   rest of the hearing.

15           MR. BABINEAU:  I am.  I'm staying, Judge.

16           THE COURT:  That brings us to the point, Mr. Perry,

17   determining how to proceed yet again in your case.  I

18   believe the last time the Court told you that this was the

19   last counsel that would be appointed.  I, however, will

20   still obviously listen to how you wish to proceed.  It's up

21   to the Court to make the legal determination of how we are

22   going to proceed, but I will still hear you on the

23   methodology about which you proceed, but at some point there

24   is case law, I haven't gotten to that point yet, where if

25   the Court can't find an attorney to represent you, then the

```
1    Court has to determine at that point how to proceed in the
2    case.
3              So you're still under oath, Mr. Perry.  If you
4    would stand up and tell the Court whether you wish the Court
5    to try to find, and I don't know, frankly, at this point who
6    is available to represent you that has the requisite
7    experience and ability to deal with the case, but you're
8    under oath, and I will ask you whether you wish the Court to
9    endeavor to appoint another attorney to represent you?
10             THE DEFENDANT:  Yes, ma'am.
11             THE COURT:  Whether you want to represent yourself,
12   if you represent yourself, whether you wish standby counsel.
13   That is, obviously, ultimately a decision for the Court,
14   whether you have standby counsel or not.  So at this
15   juncture how do you wish to proceed?
16             THE DEFENDANT:  I'll stand on my Sixth Amendment.
17             THE COURT:  Sir?
18             THE DEFENDANT:  I said I wish to stand on my Sixth
19   Amendment, my right to counsel.
20             THE COURT:  You want the right to endeavor to
21   appoint another counsel to represent you?
22             THE DEFENDANT:  Yes, ma'am.
23             THE COURT:  Do you wish to represent yourself?
24             THE DEFENDANT:  No, ma'am.
25             THE COURT:  So you do not wish to represent
```

1    yourself.  Do you understand then if I appoint counsel, it

2    is counsel's decisions that control in the case and not

3    yours?

4              THE DEFENDANT:  What you mean?

5              THE COURT:  In other words, you can't keep firing

6    your counsel, as you say, or threatening your counsel, as

7    you say, just because they don't agree with you.

8              THE DEFENDANT:  I didn't threaten Mr. Babineau.

9              THE COURT:  I find to the contrary.  I am telling

10   you that.

11             THE DEFENDANT:  I didn't threaten him.

12             THE COURT:  Mr. Perry, you cannot keep threatening,

13   intimidating counsel, and you can't keep firing them because

14   they don't agree with you.  That doesn't mean that counsel

15   won't abide by what you ask.  In other words, Mr. Babineau

16   didn't file any stipulation.  Mr. Babineau didn't agree to

17   any stipulation, but you cannot get angry with him and you

18   cannot threaten him.

19             THE DEFENDANT:  I didn't.

20             THE COURT:  Because he offers something to you that

21   has been offered by the United States or he's giving you a

22   trial strategy.  I am just telling you you cannot do this,

23   and I find to the contrary.  I found Mr. Babineau to be

24   credible.

25             THE DEFENDANT:  I'm telling you.

1          THE COURT:  What he said to the Court has been
2    corroborated by the other matters in the case.  So I'm
3    asking you, do you want new counsel?
4          THE DEFENDANT:  Yes, ma'am.
5          THE COURT:  Do you understand that counsel is the
6    one who is running the case, not you?
7          THE DEFENDANT:  I think so.  I think I understand.
8    I really -- I really -- at the end of the day, the only
9    one -- this is my life on the line here, you know what I'm
10   saying.
11         THE COURT:  That's what the Court is concerned --
12         THE DEFENDANT:  If we come to agree on case law or
13   something like that, you know what I'm saying, I'm willing
14   to work with a lawyer and meet them halfway.  I was willing
15   to meet Mr. Babineau halfway.  As I said, Mr. Babineau gave
16   me some advice, and I asked him what was the case law to
17   back it.  He never produced it.
18         THE COURT:  I'm not going to repeat myself anymore.
19   I'm just saying that if the Court can find a new lawyer to
20   represent you, it's the lawyer's responsibility to make
21   filings and to suggest a defense to you, and, in fact, it's
22   his duty or her duty under the law to pass on to you
23   anything the United States offers.  If they offer
24   stipulation, he has a legal duty to tell you.  If they offer
25   a plea agreement, he has a legal duty to tell you.

1          THE DEFENDANT:  I understand.

2          THE COURT:  You do not have to accept it.

3          THE DEFENDANT:  Yes, ma'am.

4          THE COURT:  When you don't accept it, he doesn't

5     file, but he has a duty to guide your defense.  Do you

6     understand?

7          THE DEFENDANT:  Yes, ma'am.

8          THE COURT:  Then you can be seated.

9          Frankly, at this point I may have to go out of the

10    area to find an appropriate defense counsel, but I will

11    endeavor to appoint new counsel as quickly as I can.  Until

12    such time, the trial date stays on the docket.  I don't know

13    whether if we can find new counsel or what will happen, but

14    the trial date stays on the calendar.

15         Mr. DePadilla, go ahead and request these audit

16    trails, and if you are able to get them, you should turn

17    them over to new counsel, and you should so advise the Court

18    with a copy to counsel that you've gotten them.

19         Mr. Babineau, you are to retain your file and turn

20    it over to new counsel when appointed.

21         MR. BABINEAU:  Yes, ma'am.

22         THE DEFENDANT:  Yes, ma'am.

23         THE COURT:  Yes.

24         THE DEFENDANT:  Can I ask, can I just ask what --

25    could I have an actual copy of the DVD, like?  Could it be a

```
 1    copy with the footage up there?  Can my counsel be appointed
 2    a copy -- all the Cox video cam footage on the DVD?
 3              THE COURT:  The DVD that was in evidence with the
 4    Court?
 5              THE DEFENDANT:  Yeah.  Yeah.  Could my counsel be
 6    provided a copy, actual footage of it because the one that
 7    Mr. Babineau has is blank.
 8              THE COURT:  It's in evidence.  I have viewed it.
 9              THE DEFENDANT:  My counsel, he has a blank.
10              THE COURT:  I will ask him.
11              THE DEFENDANT:  It's blank.
12              THE COURT:  I'm going to ask Mr. Babineau.  A copy
13    of the DVD that is in evidence here in the court?
14              THE DEFENDANT:  Yes, ma'am.
15              THE COURT:  You have seen it.  I have seen it.  All
16    the counsel have seen it.  Counsel had been passing it
17    forward.
18              THE DEFENDANT:  He evidently haven't seen it.
19              THE COURT:  Mr. Perry, please.  Let's maintain the
20    decorum here.
21              THE DEFENDANT:  Yes, ma'am.
22              THE COURT:  I'm doing the best I can to be sure you
23    get what it is that you want to see and you need.
24              THE DEFENDANT:  Yes, ma'am.
25              THE COURT:  I know it's preserved in evidence.  I
```

1    know that as a fact because it was played, it's part of the

2    suppression hearing.  So I can assure you there is a DVD,

3    and I can assure you that I have seen it and you have seen

4    it.  I can assure you that if for some reason counsel

5    doesn't have it, I can't imagine they don't, but if they

6    don't, you will.

7            THE DEFENDANT:  Ask him.

8            THE COURT:  I'm going to ask him, Mr. Perry.

9    Mr. Perry, if you would please be seated.

10           Mr. Babineau, do you have a copy of the DVD?

11           MR. BABINEAU:  I do, Judge.  I actually have five

12   DVDs, including Mr. Grindrod's file on the DVD, jail calls.

13   In addition to that, Mr. Grindrod and I had a conversation,

14   and he has copied, re-copied some other documents that he

15   had from his file that he's not sure whether they were

16   passed on, and they are at the desk at the Federal Public

17   Defender's office, and when I leave here today, I will swing

18   by there and pick them up, and I will have them, too, so I

19   will pass them on to the next lawyer.

20           But I'm confident that everything that Mr. Perry

21   wants is contained within the DVDs that I have in my

22   possession.

23           THE COURT:  I'm looking at you holding them.

24   That's what you're holding up?

25           MR. BABINEAU:  Yes, ma'am.

1          THE COURT:  Thank you.

2          Then we will, in a moment, conclude this

3     proceeding, and in summary, the jury trial remains for March

4     31 at 11:00 a.m. in this court.

5          Number two, the Court will be inquiring with the

6     marshals about proper security measures to maintain the

7     integrity of the trial process.

8          Number three, the Court will, at the conclusion of

9     the hearing, allow Mr. Babineau to withdraw and have no

10    further communication or contact with the defendant with the

11    one condition that he pick up any documents that are

12    awaiting for him at the Federal Public Defender's office,

13    that he makes them part of his file, and that his complete

14    file is then turned over to the new attorney.  In the order

15    I am going to direct the new attorney to contact all of the

16    previous attorneys to be sure they have all of their files.

17         In other words, I will put that in my order that

18    new counsel shall contact the Federal Public Defender.  The

19    next one was Mr. Woodward, and then the next one was

20    Mr. Hobbs, and the next one was Mr. Babineau to be sure that

21    they have everything, that they passed on everything to new

22    counsel of the defendant.  That should be the Federal Public

23    Defender.  Mr. Grindrod is passing everything on to you.  So

24    be sure you sign for those papers.

25         MR. BABINEAU:  Yes, ma'am.

1          THE COURT:  So we will see that everything is
2     assuredly by court order with the next attorney.  In the
3     meantime, I consider this as basically the defense's motion
4     for new counsel at this point because I've got to find new
5     counsel.  So that's where we are in the process.
6          Is there anything you want to add, Mr. DePadilla,
7     Mr. Jackson?
8          MR. DePADILLA:  No, Your Honor.  Thank you.
9          MR. JACKSON:  Nothing, Your Honor.
10         THE COURT:  Anything further, Mr. Babineau?
11         MR. BABINEAU:  No, ma'am.
12         THE COURT:  Then I think that the Court has
13    considered all the outstanding matters, and we are trying to
14    go forward towards the current trial date, which remains on
15    the Court's docket.  The Court stands in recess until
16    tomorrow.
17         (Hearing adjourned at 4:23 p.m.)
18                        CERTIFICATION
19
20     I certify that the foregoing is a correct transcript
21    from the record of proceedings in the above-entitled matter.
22
23         X_____/s/_____x
24                       Jody A. Stewart
25                       X_____2-8-2021 _____x

JODY A. STEWART, Official Court Reporter

1       Date

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25